The ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, Appellant,

v.

Mrs. U. B. PORTER et al., Appellees.

No. 7674.

Court of Civil Appeals of Texas.

Amarillo.

Jan. 9, 1967.

Rehearing Denied Feb. 20, 1967.

**616**

---

McWhorter, Cobb, Johnson & Cobb, Lubbock, Charles L. Cobb, Lubbock, of counsel, for appellant.

Lawrence F. Green, Lubbock, Splawn & Maner, John F. Maner, Lubbock, of counsel, for appellees.

CHAPMAN, Justice.

This is a suit by Mrs. U. B. Porter, et al., seeking to recover against the appellant railroad company for alleged diversion of the natural flow of surface waters by the construction of a culvert through their roadbed by which they prevented such waters from flowing over their land " * * * in a harmless and diffused state," thus causing damage to their property in violation of Article 7589a, Vernon's Ann. Revised Civil Statutes of Texas.

Appellant railway company defended on averments and proof that the culvert placed through their roadbed was properly constructed so as to permit the surface waters to seek their natural level. It pleaded Article 6328, Revised Civil Statutes of Texas, averring in effect that said statute requires railroads such as theirs in constructing roadbeds to install the necessary culverts or sluices as the natural lay of the land requires for the necessary drainage thereof, which is a continuing duty; that the culvert constructed was for the purpose of complying with such statute; that upon the failure to comply therewith the property owners on each side could compel the erection of such drainage system by injunction; and denied the construction and maintenance has changed the natural flow of surface waters over and across appellees' lands.

The railroad embankment was constructed in a northwesterly direction from Sudan toward Texico and the area involved is approximately 5½ miles northwest of Sudan.

The trial court, after denying a motion for peremptory instruction made by appellant, submitted the case to the jury upon a question which asked: "Do you find from a preponderance of the evidence that the opening and installation of the culvert in question *and the associated railroad embankment* have diverted water from its natural flow onto the Porter land?" (All emphases herein are ours.)

The court then inquired if the water so diverted destroyed crops then growing upon the Porter land, and asked the jury to find the amount of damages. The jury answered the first two questions in the affirmative and assessed $650 damages to 6½ acres of Sudex, a forage crop. Appellant filed proper objections and exceptions to the submission of the issues, and after verdict filed its motion non obstante veredicto and motion for new trial. All were overruled and judgment rendered for appellees.

The railroad embankment had been constructed 53 years before the culvert was placed through it. At the time of construction of the roadbed the land in the low areas on each side of the right-of-way was in pasture land and there was no need for the culvert. U. S. Highway 84 parallels the railway tracks on the southwest side at the point in controversy and the evidence shows appellant was under pressure from the State Highway Department

(obviously because the embankment, serving as a dam, flooded the highway during excessive rains) to correct their embankment in order for the water to follow its natural flow.

Appellees pleaded a prescriptive right for maintenance of the railway embankment without the culvert and pleaded laches and stale demand by way of an estoppel as against the railway company for placing the culvert in its roadbed after more than fifty years of maintenance without the culvert. The trial court determined the legal questions just mentioned against appellees and submitted the case upon the issues above mentioned. No cross points are brought forward on the questions.

Article 6328, Revised Civil Statutes of Texas, provides: "In no case shall any railroad company construct a roadbed without first constructing the necessary culverts or sluices as the natural lay of the land requires, for the necessary draining thereof."

■ The statute just quoted was passed in 1876 and we find no amendment or alteration to it during all these years. Since the railroad was under this statutory duty before the embankment in question was constructed the predecessors in title to appellees were charged with knowing the law as it existed at the time the contract was made for construction of the railway embankment across the land involved, and the statutory duty imposed upon the railroad company necessarily implied a continuing obligation to maintain its roadbed in accordance with the provisions of the quoted statute. Meier v. Thompson, 248 S.W.2d 493, 499 (Tex.Civ. App.-Waco, 1952, writ ref'd n. r. e.); Burlington-Rock Island R. Co. v. Newsom, 219 S.W.2d 129, 132 (Tex.Civ.App.-Waco, 1949).

■ The statute above quoted makes absolute the duty of the railway company to erect such culverts and sluices as the natural lay of the land requires for the

necessary draining thereof. Missouri, K. & T. Ry. Co. of Texas v. Arey, 100 S.W. 963, 966 (Tex.Civ.App.-1907); Ft. Worth & D. C. Ry. Co. v. Suter, 54 Tex.Civ.App. 238, 118 S.W. 215 (1909).

■ If a railway company fails to construct the proper culverts, sluices or ditches necessary to pass off the surface water by the way it flowed before the railroad was built, it is responsible for the damage incurred from such neglect. Gulf, Col. & S. F. R'y Co. v. Helsley, 62 Tex. 593 (1884); Gulf, C. & S. F. R'y Co. v. Holliday, 65 Tex. 512 (1886); Gulf, C. & S. F. R'y Co. v. Donahoo, 59 Tex. 128 (1883).

The Supreme Court of Texas has said: "The object of this statute was to prevent the railroad from unnecessarily interfering with the natural drainage of the land on either side of its right of way." Dobbins v. Missouri, K. & T. R'y Co. of Texas, 91 Tex. 60, 41 S.W. 62, 38 L.R.A. 573 (1897).

In speaking of this same statute when it was Article 4171 under the Revised Civil Statutes of 1879 the same court in Gulf, Col. & S. F. Ry. Co. v. Helsley, supra, said:

"It was intended thereby to compel railways to construct such culverts or sluices as were necessary to permit water not confined within water-courses, as that term is usually understood in legal works, to flow, after a railway is constructed, as it did before, in accordance with the 'natural lay of the land;' to compel them to permit the flow of surface water as it aforetime had naturally done; and culverts or sluices which do not permit this are not the necessary culverts or sluices contemplated by the law.

"If a railway company undertakes to change the flowing of surface water, it must see to it that such change does not operate to the injury of the landowner."

Appellees' pleadings seek no damages for diversion of the natural flow of the water caused by the railroad embankment. In fact, they assert by brief that: "It is the tunnelling under the embankment and the installation of the culvert through such tunnel, causing the surface waters to be discharged onto Appellees' land in increased quantities and in concentrated flow, causing damages to Appellees' crops, that forms the basis of Appellees' cause of action in the instant case."

 Since no point is raised by appellant on the great weight and preponderance of the evidence, we must, therefore, determine if there is any probative evidence which ought reasonably to satisfy the jury that the fact sought to be proved is established. Texas Law of Evidence, McCormick and Ray, 2d Edition, Vol. 1, p. 8, sec. 4. "To sustain the action of the court in disregarding the finding, there must be no evidence of probative force supporting it." Iowa Mutual Insurance Company v. Redden, 326 S.W.2d 727 (Tex.Civ.App.-Waco, 1959, writ ref'd n. r. e.). "Judgment non obstante veredicto may be rendered by the trial court only in a case where a directed verdict would have been proper." Hicks v. Matthews, 153 Tex. 177, 266 S.W.2d 846 (1954). It is our opinion that the motion for peremptory instruction, motion for judgment non obstante veredicto or motion for new trial should have been granted in this case, as we shall attempt to demonstrate from the evidence.

 Mrs. Porter Davis, one of the appellees, testified in an effort to show the appellant diverted the water from its natural flow by the construction of the culvert. Neither her mother nor brother, the other owners of the land, testified. She admitted that the low area on their land is part of the same basin south of the railway embankment. It is true she later contradicted her own testimony in this respect but admitted there is a low area on their land. That evidence taken in its most favorable light still would not, in our opinion, show that the construction of the culvert in question diverted the water from its natural flow. Some of the photographs introduced by appellees themselves show the water as it made its exit from the culvert, instead of coming over on their land at that place, ran down the railroad right-of-way in a northwesterly direction. This is material as we study the civil engineering drawings which show the elevation of the land on each side of the embankment and the high and low areas on each side.

Mrs. Davis also attempted to testify that the elevation on their side of the embankment was higher than the elevation on the other side without a proper predicate being laid as to her ability to testify to elevations. A careful study of the statement of facts will reveal that the trial court sustained objections to such testimony and that counsel for appellees pursued such testimony no further. She also testified that their land sloped toward the railroad embankment. Since there is a twelve-foot embankment, that testimony also constituted no probative evidence to show the water was diverted by the culvert from its natural flow, to their damage. It must be remembered that Mrs. Davis did not move on the land in question until 1934, twenty-two years after the roadbed had been constructed, so she could not possibly have known the lay of the land in its natural state before it was disturbed by the hands of man, nor which side of the embankment was the lowest. This leaves no probative evidence except the engineering data in that respect.

We feel Exhibit "d–10" and the testimony of appellant's engineer, B. E. Taylor, in connection therewith, is decisive of the issue. Such testimony shows by civil engineering, scientific data made by transit citings for locations and a level for elevations that the area consisting of 14.45 surface acres on appellees' land and the basin on the south side of their railway embank-

ment and right-of-way[1] is in the same drainage basin; that it drains from southwest to northeast and that the level at which the railway company constructed the culvert would allow the natural drainage of the surface water through the railroad embankment, permitting surface waters to seek their natural level.

"Q. I will ask you if the basin on the Porter land adjoining the right of way is approximately the same level as the basin on the land just across the highway there from the right of way, are they both low areas?

"A. Yes, sir, they are. The Porter, or the land on the north side of the right of way is lower. The natural land is lower than the natural land on the south side."

A study of the "Drainage Area" water shed on the south of the railway right-of-way approximately 6,700 feet south of the right-of-way shows a height of 3,859.8 feet above sea level with a slope down to 3,830.2, then a slight rise at that point on the contour to 3,832.0, which caused the water to flow back north to 3,810.4. The civil engineer testified that the last named point is the lowest natural level in the lake bottom on the south side of the railroad embankment and that the natural level on the north side is lower than the natural level on the south side. There is no probative evidence, in our opinion, to contradict such testimony and engineering data.

Appellees contend by brief that the culvert, constructed after a lapse of more than fifty years, diverted the surface water onto appellees' land in unnatural and accelerated quantities. We do not agree that the record supports the contention. To the contrary, the testimony shows that when the stream of water makes its exit from the culvert it stays on appellant's right-of-way, flows northwest down its

property to the low point, following the lay of the land, then " * * * the water will start creeping and building up. It will stack against our embankment and at the same time moving to the north out on the Porter land until such time as it reaches the overflow elevation of 3812.4," at which time it overflows to a larger lake east of appellees' land.

"Q. And that would be the natural flow of the water according to engineering calculations made by you, is that correct, sir?

"A. Yes, sir."

The testimony shows the water on the south side of the embankment has to build to an elevation of 3,812.4 feet before it passes through the culvert and that is the same elevation at which it escapes from appellees' land to a larger lake to the east. However, we have been unable to find any probative evidence in the record that the water going through the culvert is " * * * discharged onto appellees' land in increased quantities and in concentrated flow" as they contend. To the contrary, the evidence shows it runs down the railroad right-of-way in a northwesterly direction to the low part of the basin, following the lay of the land, then will start creeping over onto appellees' land, which the engineering data shows is lower than that on the south side of the embankment. There is no probative evidence to the contrary.

We also believe appellant's fifth and sixth points raise questions which would require this court to reverse and remand the case for another trial. These points go to the submission of the above quoted issue and to the definition of "natural flow of water."

Appellees admit by brief they were not relying on the embankment built more than fifty years ago as any grounds for divert-

---

1. Though the railway ran in a northwesterly direction from Sudan, the area on each side of the right-of-way is referred to generally in the record as the south side and north side. We shall hereafter refer to them as such. Appellees' land was on the north side.

ing the natural flow of the water. Their pleadings seek recovery only for diverting the natural flow of the water by the opening and installation of the culvert. Yet, the issue in question includes the embankment by asking if the opening and installation of the culvert *and the associated railroad embankment* diverted the water from its natural flow.

Appellant's Special Instruction No. 1, if given, perhaps would have cured the error, but it was refused. The issue, taken in connection with the definition that: "By the 'natural flow' of water, is meant the course that water will or would flow upon the earth's surface if not affected by man-made works or structures" would lead the jury to believe that both the embankment and the culvert could be taken into consideration in determining if the railroad diverted the natural flow of water to appellees' damage.

Having held there is no probative evidence to support the judgment, we would have authority to reverse and render. Believing, however, that the case was tried and submitted on the wrong theory, and was not fully developed, we feel the ends of justice would be better served by reversing and remanding. We have such authority under these circumstances. Jackson v. Hall, 147 Tex. 245, 214 S.W.2d 458 (1948); Lanford v. Smith, 128 Tex. 373, 99 S.W.2d 593 (1936). In the last cited case the Supreme Court of Texas said:

> "If the Court of Civil Appeals determines that the judgment of the trial court is unsupported by the evidence, or that the evidence in support thereof is insufficient, its judgment should be one of remand and not one of rendition, unless it appears that the facts were fully developed at the trial appealed from."

Accordingly, the judgment of the trial court is reversed and remanded for a new trial.

